**2018 BNH 008**          **Note: This is an unpublished opinion.  Refer to LBR 1050-1 regarding citation.**
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 14-12447-BAH
                                                               Chapter 7
Peter J. Lombard, Jr.,
               Debtor


Robert Browne,
               Plaintiff
v.                                                             Adv. No. 17-1004-BAH

Peter J. Lombard, Jr.,
               Defendant


*Marc W. McDonald, Esq.*                    *Brad C. Davis, Esq.*
*Ford & McPartlin, P.A.*                    *Davis/Hunt Law, PLLC*
*Portsmouth, New Hampshire*                 *Franklin, New Hampshire*
*Attorney for the Plaintiff*                *Attorney for the Defendant*


## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

The following memorandum is the Court's decision on the merits of plaintiff Robert Browne's ("Browne" or "Plaintiff") complaint against Peter Lombard (the "Debtor"), in which Browne seeks to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A).[1]  The Plaintiff's complaint touches on five statements or omissions that the Debtor allegedly made: (1) that he had "no role" in an entity named Patrilom, LLC ("Patrilom"); (2) failing to disclose a "hidden beneficial interest" in a second entity, Sub Crazy, Inc. ("Sub Crazy"); (3) claiming that his daughter Ashley Lombard signed a loan application on behalf of a third entity, Café Bella

---

[1] Hereinafter, "§," "section," and "Bankruptcy Code" will refer to title 11 of the United States Code, unless otherwise indicated.

Sera, Inc.; (4) claiming that Patrilom had owned 100% of the shares of Café Bella Sera, Inc.; and (5) claiming that he gave Browne $80,000 worth of gift cards in repayment of a debt.

As an ancillary matter, the Court also has under advisement Browne's motion to conform the pleadings to the evidence admitted at trial (the "Motion to Conform").  In the Motion to Conform, Browne seeks to amend his complaint to add a basis for relief under § 727(a)(4)(A). This latent count would seek to deny the Debtor's discharge for failing to disclose his receipt of funds from Sub Crazy as income in his bankruptcy schedules.

For the reasons set forth below, the Court finds Browne's complaint without merit and will enter judgment in favor of the Debtor.  The Court will, additionally, deny the Motion to Conform because it does not meet the legal standard for such motions in this circuit.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

### A.  Pre-Bankruptcy Events

#### (i) The Café Bella Sera Business

Virtually all of the general background in this case comes from the Court's earlier decision that resolved the first round of litigation between the parties.  See generally Browne v. Lombard (In re Lombard), 2016 BNH 005 (affirmed in Browne v. Lombard (In re Lombard), No. 16-cv-139-JD (D.N.H. Aug. 12, 2016)) (hereinafter "Browne I").  The Court must look to its earlier decision because the parties did not introduce much evidence that helps to explain who the parties are, what they did before this dispute arose, and what their relationship was.

Prepetition, the Debtor ran several different restaurants in Florida from 2008 to 2014.[2] Of these, the relevant one is Café Bella Sera. Two different entities were established to run the Café Bella Sera business and own its assets, Café Bella Sera, Inc. and Patrilom.[3] While the big picture is simple—the Debtor was the head chef and manager of the Café Bella Sera business in practice—the details of the relationship between the Debtor and these entities is fraught with confusion. During pretrial practice in this proceeding, the parties agreed that at all relevant times the Debtor was the owner of 100% of the shares of Café Bella Sera, Inc.[4] Yet, during the trial, the Debtor testified that his lawyer directed him to transfer his Café Bella Sera, Inc. shares to Patrilom, making it the parent company of Café Bella Sera, Inc.[5] This testimony was corroborated by documentary evidence that Browne introduced at trial—a letter from the Florida Department of Revenue noting that, according to information provided to it by Patrilom, Patrilom owned Café Bella Sera, Inc. as of January 1, 2012.[6] In addition to the Florida Department of Revenue letter, the Debtor introduced an unsigned bill of sale that he testified embodied the sale transaction of Café Bella Sera, Inc. to Patrilom. Finally, this testimony was consistent with the Debtor's testimony in Browne I. Given the confusion in the record, the Court cannot make a definitive finding about whether Peter Lombard or Patrilom owned Café Bella Sera Inc. on the petition date.

The ownership makeup of Patrilom is also unclear. Peter Lombard testified variously that his two daughters, Ashley and Haley, owned Patrilom with his wife, Patricia. At other times

---

[2] Browne I at 2.

[3] There is some confusion in the record over whether "Patrilom" is spelled with one or two "l"s. One "l" seems to be the correct spelling, as the name appears spelled that way in the Debtor's schedules and most of the documents in the record. See, e.g., Ex. 9 at 11; but see Trial Transcript at 5: 4-6.

[4] AP Doc. No. 27, Statement of Material Facts, ¶ 11. The Court will use "AP Doc. No." when referring to items on the docket of Adv. No. 17-1004-BAH and "Bk Doc. No." when referencing the docket of Bk. No. 14-12447-BAH.

[5] No one objected to the admission of this testimony, even though it apparently contradicted the summary judgment record, which the Court ruled would be admissible at trial. See infra at § II(B)(iv)(b).

[6] Ex. 34.

he added that his mother owned some shares, in addition to the other three owners. Additionally, he has previously testified that just Ashley owned Patrilom.[7] The purpose of these apparent changes in ownership makeup is not evident from the record. The Court can find, however, that there is no evidence that the Debtor ever owned Patrilom, either directly or indirectly. The Debtor was involved in Patrilom's creation, as he testified that the entity was set up based on legal advice provided by his attorney.

The documentary evidence consistently shows that both Café Bella Sera Inc. and Patrilom played ill-defined roles running the single restaurant business "Café Bella Sera." Because their separate roles are so ill-defined, the Court will refer to "Café Bella Sera" when referring to the business as a whole, and to "Café Bella Sera Inc." when referring to just that entity, separate from Patrilom. Adding to the confusion, Patrilom sometimes used the appellation "d/b/a Pete's Café Bella Sera" or "d/b/a Pete's Café Bella Sera and Steakhouse" when carrying out Café Bella Sera business.[8] All of the evidence indicates that the Debtor was the directing force behind Café Bella Sera as a non-officer "manager" and "head-chef." When it came to Patrilom, this authority was informal; the only formal authority the Debtor had within that entity was check-signing authority. The Debtor was an officer only at Café Bella Sera, Inc. In practice, the legal distinctions and corporate formalities of having two separate entities run one business were not observed. As a further example, the Debtor would hold himself out as the "manager" of Patrilom "d/b/a Pete's Café Bella Sera" even though there is no evidence that he ever had that official title with respect to Patrilom. For example, documents Browne obtained from TD Bank list Peter Lombard as a "Manager" of Patrilom along with his daughter Ashley

---

[7] Browne I at 2 ("The Debtor testified unequivocally that his daughter owned Patrilom, LLC and that he had no ownership interest in it.").
[8] See, e.g., Ex. 12 at 1—a check written on Patrilom's account.

Lombard.[9]  There was no detailed testimony about the circumstances surrounding the signing of this document.  The Debtor simply testified that he signed it as a manager to obtain authority to use the bank account, but that it did not mean he was an officer or owner of Patrilom.[10]  The Debtor testified that he thought it was fine to hold himself out as a manager, as long as the "d/b/a" was appended to the name Patrilom, since he knew he was Café Bella Sera's head chef and manager.[11]

### (ii)  The Debtor's Involvement with Browne

In 2008 Café Bella Sera ran into financial trouble.  Browne provided financial assistance to Café Bella Sera, infusing the business with more than $300,000 between 2008 and 2011.[12]  It was unclear to the Court in Browne I—and it is still unclear now—whether the financial assistance Browne provided the Debtor and Café Bella Sera was initially conceived of as a gift or as a loan.  The Debtor contends that it was a gift initially and Browne argues it was always a loan.  Eventually, both parties appear to have come to the understanding that the Debtor had to pay Browne back.[13]

---

[9] Ex. 13 at 11-12.  One of the documents opens a bank account for Patrilom; the other adds the Debtor and Ashley Lombard as individuals authorized to use the account.
[10] Trial Transcript 18: 22-25; 19: 1-25: 20: 1-20.
[11] During cross examination the Debtor explained the use of the d/b/a:

> Q.      Do you see that there? There's a check, but on the check -- and you've brought this up several times -- this is Patrilom, LLC, doing business as Pete's Café Bella Sera and Steakhouse. You keep emphasizing the dba portion. Why are you doing that?

> A.      Because I knew it was like Café Bella Sera was always me, you know.

> Q.      So the dba Pete's Café Bella Sera and Steakhouse is you?

> A.      Yes.

Trial Transcript 101: 24-25; 102: 1-8.
[12] The cash came from Browne personally and from two entities he controls, Aqua Gulf Transport, Inc. and JRL Properties, Inc.  Browne I at 2.
[13] Id. at 3.

In 2012, Browne began to demand repayment of the funds he had provided Café Bella Sera and the Debtor.  The Debtor, in turn, began to make some payments to Browne.  In April of 2013, apparently in an effort to secure a new source of funds for the business, Café Bella Sera, Inc. applied for a loan from American Express Merchant Financing.[14]  This loan was eventually approved.[15]  In the loan application and agreement, Ashely Lombard is identified as a "managing member" of Café Bella Sera, Inc., which itself was identified as a limited liability company doing business as "Pete's Café Bella Sera."  She also—at least ostensibly—signed the loan application and agreement. These details create confusion over whether the borrower was supposed to be Patrilom or Café Bella Sera, Inc.

### (iii) The Formation of Sub Crazy

In late October 2013, Patricia Lombard incorporated a new restaurant business in New Hampshire known as Sub Crazy.  Shortly after Sub Crazy's incorporation, Café Bella Sera began to transfer funds to the new company.  In early 2014, Patricia Lombard left her role at Café Bella Sera, moved to New Hampshire, and opened Sub Crazy as its sole owner and officer.  The Debtor was an authorized signatory on Sub Crazy's bank account. He used this authority to write and cash checks, which he testified were for Sub Crazy business purposes or for when the funds were needed at Café Bella Sera.[16]  Café Bella Sera closed its doors in the early summer of 2014, and Peter Lombard moved to New Hampshire, where he began to help out at Sub Crazy on an informal basis.

---

[14] Ex. 1.
[15] Ex. 2.
[16] Ex. 28, Patricia Lombard AP Trial Transcript excerpt.

### B.  Post-Bankruptcy Events

#### (i)  Schedules and the First 2004 Examination

The Debtor filed this bankruptcy case in December 2014.  In his Statement of Financial Affairs ("SOFA"), the Debtor identified that he was an "officer, director, partner, or managing executive" of both Patrilom and Café Bella Sera, Inc.[17]  He additionally described Café Bella Sera, Inc.'s business as a "restaurant" and Patrilom's business as a "holding company for Café Bella Sera, Inc."  He listed a debt owing to Browne and his companies in the amount of $387,080.[18]  This debt is not marked as disputed, contingent, or unliquidated.

In May 2015, Browne conducted a 2004 examination of the Debtor.  During this examination the Debtor answered several questions about his relationship with Patrilom:

> Q.     Okay.  With respect to Patrilom, were you ever a shareholder in that?
> A.     No.
> Q.     Did you ever have any role at all with respect to Patrilom?
> A.     No.[19]

Shortly after taking the 2004 examination, Browne filed the adversary proceeding in Browne I.

#### (ii)  The Browne I Adversary Proceeding

The claims in Browne I included three § 727 counts: failure to keep or preserve records, failure to explain a loss of assets, and false oath or account.[20]  During the course of the Browne I trial, Peter Lombard again answered questions about his relationship with Patrilom and testified about his relationship with Sub Crazy:

> Q.     Okay. Can you tell me what is Sub Crazy?

> A.     It's a business that operates in Meredith, New Hampshire.

---

[17] Ex. 9, SOFA Question 18.
[18] Id. at 27.
[19] Ex. 20 at 2: 6-11.
[20] See Browne I at 4.

Q.      Okay. It's a sub shop, right?

A.      Yes.

Q.      Okay. And who owns and operates that business?

A.      My wife.

Q.      And you recall that I asked you whether you had anything
to do with that business in your deposition?

A.      I sure do.

Q.       Okay. And your testimony was that you got nothing to do with it,
right?

A.      I have nothing legally to do with that business whatsoever.

Q.      And in fact you also testified, by the way, that you had nothing to
do with Patrilom, LLC, right?

A.      That's correct. I was just a signer on the account.  On the checking
account, but I had nothing to do legally.

Q.      So you had nothing to do with it, but you were authorized to sign
checks—

A.      Yes.[21]

Additionally, on cross-examination, the Debtor testified about his practice of issuing gift

cards to Browne for him to use at Café Bella Sera:

Q.      The next email which is May—I guess this is going backwards—so the
prior email which is the one in the middle, which is May 29, 2014, there's some
discussion about you accounting for about [$]55,000 in cards issued to Bobby
[Browne]. What are you -- what cards are you talking about there?

A.      Bobby would come into the restaurant, as I said, probably four or five
times a week. He would come in with large groups from his company or with his
friends coming for lunch and his dinners. Because of the dollar value that he
helped me with, it definitely was no way that he was ever going to pay for any
product in my restaurant, but I had to be able to compensate for that product. I just
couldn't, you know, have him sign a check or do that, so we had gift cards like
any other company does that are, you know, magnetically swiped and we would

---

[21] Ex. 19, Browne I Trial Transcript at 32: 5-25.

issue him in increments sometimes of five and [$]10,000.  He would be sitting at the bar one night and the gift card, I don't know how low it would be, but he would come over to me and say "Petey, hit me with another five dimes." And swipe the card and I'd hit him with another $5,000 and he would use that to even drink at my restaurant.[22]

Finally, the Debtor also testified on direct examination about the existence of certain business records in a storage "pod" in Florida that related to the Café Bella Sera business:

Q.      You also have a storage pod down in Florida, right?

A.      I do.

Q.      You do or you did?

A.      I do.

Q.      And does that contain records?

A.      It does.

Q.      Does that contain records of Café Bella Sera?

A.      It does.[23]

This testimony demonstrates that Browne knew about the existence of the storage pod in Florida prior to the trial in Browne I.  After the trial, the Court found Browne's claims to be without merit.

(iii)  Events Leading up to the Browne II Adversary

Patricia Lombard filed a chapter 7 bankruptcy petition shortly after the affirmance on appeal of Browne I.  Browne and his companies were also active creditors in Patricia's case, filing claims for the same debt that they sought to collect from the Debtor.

---

[22] Id. at 65: 9-25; 66: 1-3.  The Court does not have the email about which the Debtor is testifying in his answer to this question in evidence.  Additionally, it is not apparent from the parts of the transcript that are in the record what part of the direct examination this question relates to.  This missing context makes it difficult for the Court to draw broad conclusions about this testimony.
[23] Browne I Trial Transcript at 40: 21-25; 41: 1-3.  The Court has taken judicial notice of this portion of the transcript.

On December 7, 2016, the Court authorized an extension of time for Browne to file a complaint to object to the Debtor's discharge which, because of the <u>Browne I</u> litigation, had yet to enter.  Browne represented, through his attorney, that the complaint would be limited to false oaths relating to Sub Crazy, of which he had only recently become aware through discovery taken in connection with Patricia Lombard's case.  The Court explicitly took that representation into account and extended the deadline to file § 727(a)(4)(A) complaints, but only for those alleged false oaths relating to Sub Crazy.[24]

(a)  The Second 2004 Examination

In December 2016, the United States Trustee obtained authority to conduct a Rule 2004 examination of the Debtor.  The examination took place on January 3, 2017.  During the examination, the Assistant United States Trustee, Geraldine Karonis, questioned the Debtor about how much he had paid to Browne:

Q.    How much did you pay him back all together? It wasn't clear to me?

A.    It was probably, you know, from checks that were written from the business, not including gift certificates and signing of checks and having him have events there that I didn't charge him for, probably close to $100,000, but $20,000 was in actual checks, probably about $80,000 over a four-year period of time.

Q.    Of checks?

A.    That was in food.  This is a guy that gave me $300,000.  I never charged him a nickel when he came to the restaurant.  He would drink 5 bottles of Simi Cab.  He would eat T-bone steaks.  He would have 10 people there from his company.  He never got a bill.

Q.    Did you keep records?

---

[24] The Court's extension of time was based on § 727(e) because Browne's period to file § 727(a)(4)(A) complaints had long since expired on June 8, 2015.  <u>See</u> Order (Bk. Doc. No. 23).  In granting the extension per § 727(e), the Court reasoned that Browne would have a basis to file a complaint to revoke the Debtor's discharge under this section, if the Court did not grant the requested extension of time. For efficiency's sake, rather than allowing the discharge to enter first, the Court simply approved the extension.

A.      Of course, but I can't get at them.  He knows.  He knows what he ate, and what he drank.  He would sit at the bar, and say, Pete load up that gift card. Boom, another $10,000.  That is how he would say it exactly.  If he was here, he would know it.  That is how he would talk.  Hit me with another $10,000.  Load up a gift card with $10,000 on it, and he would use that when he came to my restaurant.

Q.      Wow, that is a lot of money at one time?

A.      Not ever close.  Not even close to what he gave me, but he would spend that kind of money.  He would spend $2,000 a week there.

Q.      Was he your best customer?

A.      Without a doubt.  He was top ten customer prior to leaving us.[25]

### (iv)  The <u>Browne II</u> Adversary Proceeding – Pretrial Practice

#### (a)  Initial Proceedings

Shortly after this examination, Browne filed a second complaint seeking to deny the Debtor's discharge—the instant adversary proceeding ("<u>Browne II</u>")—and an adversary proceeding against Patricia Lombard (the "Patricia Lombard AP").[26]  Both adversaries proceeded on a parallel course through discovery and pretrial practice, but the parties did not move to consolidate the cases.

The Plaintiff's claims have shifted continuously during this proceeding, right up until the time of trial.[27]  The capricious nature of the Plaintiff's claims is evident in a brief survey of the docket.  As initially filed, the complaint in this proceeding explicitly alleged that the Debtor's discharge should be denied because of the following statements: (1) the Debtor's denial of "any ownership interest in" or "material involvement with" Sub Crazy, (2) his failure to disclose gifts

---

[25] Ex. 21.  Transcript of January 3, 2017 2004 Examination at 46: 14-23; 47: 1-23.  N.B. The cover page of this exhibit appears to indicate erroneously that the examination was taken in connection with <u>Browne I</u>.  The <u>Browne I</u> adversary was closed in September of 2016.  The court authorized this 2004 examination in the main bankruptcy case on December 12, 2016 (Bk. Doc. No. 58).
[26] <u>Browne v. Patricia Lombard (In re Patricia Lombard)</u>, 2018 BNH 007.
[27] Indeed, even after trial the Plaintiff continued to attempt to shift the bounds of the playing field. <u>See infra</u> at § II(B)(vi)(e).

or transfers in answer to SOFA Questions 7 and 10, (3) his assertion that Ashley Lombard signed the loan documents for the American Express loan that Café Bella Sera obtained, and (4) testifying during <u>Browne I</u> that Patrilom was the parent entity of Café Bella Sera Inc.[28]  Notably, the complaint set this case up for ambiguity right from the start, stating that the preceding, explicit claims of false oath were "without limitation" to the other facts recited elsewhere in the complaint that could conceivably give rise to another § 727(a)(4)(A) claim.[29]

 At the initial pretrial conference, the Court reminded the parties about the limited scope of the 727 extension.  Browne assured the Court emphatically that the claims would stay within the limitation of being related to Sub Crazy.  The Court unambiguously stated that it would not permit the re-litigation of matters that had or could have been decided in <u>Browne I</u>:

> THE COURT: All right. Well, what I want to try to make sure is that -- I mean, clearly -- you know, we've already had a trial concerning, you know, many of these operative facts and I just -- and I'm -- I'm sure -- I'd like to be confident that Mr. Browne is not thinking about some sort of a collateral attack on the findings that were made in the prior adversary, you know, by using this as a vehicle to challenge what's already been found and upheld on appeal.
> …
> I just want to make sure that we don't -- that we sort of identify or maybe, you know, re-identify early as we already did that what was decided in that case was decided in that case. And to the extent that this is a different cause of action it's not going to be an opportunity to re-litigate what was decided in the prior proceeding.[30]

At the time, neither party objected to this approach, and, to the contrary, Browne's counsel voiced his agreement that no claims from <u>Browne I</u> would be relitigated during <u>Browne II</u>.[31]

---

[28] Complaint, AP Doc. No. 1, ¶¶ 63, 65-67.
[29] <u>Id.</u> ¶ 62.
[30] Transcript of Pretrial Conference at 3: 18-25; 4: 20-25; 5: 1. (Adv. No. 17-1004-BAH, March 22, 2017). The Court has taken judicial notice of the transcript.
[31] <u>Id.</u> at 4: 1-18.

(b)  Summary Judgment

After a summary judgment motion, the Court disposed of the second claim described above—the failure to disclose gifts or transfers in answer to SOFA Questions 7 and 10.[32]  During the course of the summary judgment proceedings, the Court granted a motion pursuant to Fed. R. Civ. P. 56(g), establishing certain facts from the summary judgment record as evidence for the upcoming trial on the merits, without the need to present further evidence of the same facts.[33] This order had the effect of establishing select paragraphs from the joint statement of material facts as evidence for the trial.  One paragraph is particularly relevant: "Peter Lombard acknowledges that at all times relevant to this case, he was 100 [sic] percent owner of Café Bella Sera Inc. which operated Café Bella Sera until it closed in June of 2014."[34]  As the Court noted above, despite this fact having been "established" before trial, the parties agreed to the admission of a bevy of conflicting evidence that tended to show Patrilom had indeed been the parent corporation of Café Bella Sera, Inc.

(c)  Final Pretrial Conference, Scheduling Order, and Stipulations

The Court conducted a final pretrial conference on January 3, 2018.  At this time, Browne proposed amending his complaint—well after the deadline established in the Court's pretrial scheduling order—to add a § 727(a)(4)(A) count based on the Debtor's testimony that he had "no role" at Patrilom.  Browne represented that he had discovered new evidence indicating that the Debtor had actually been a member or manager of Patrilom.  The Court indicated that it was not going to grant any oral motion to amend the complaint without notice to the Defendant and directed the Plaintiff to file a motion.  The Court also directed the Plaintiff to file a supplement to

---

[32] AP Doc. No. 54, Order Granting Partial Summary Judgment against the Plaintiff (December 11, 2017).
[33] AP Doc. No. 56, Order (January 3, 2018).
[34] AP Doc. No. 27, Statement of Material Facts, ¶ 11.

the final pretrial statement, which at that time was six months old[35] and did not account for the result of the summary judgment proceedings.  This supplement was to specify in detail exactly which allegedly false oaths the Plaintiff intended to proceed on at trial.  The Court noted that it would not consider any such supplement to expand the scope of the complaint.

On January 10, 2018, the Court issued a final pretrial scheduling order setting the trial for March 22, 2018.  Just over a week later, on January 19, the parties filed a Joint Final Pretrial Statement that identified the legal claims they agreed were set for trial.  In the Joint Final Pretrial Statement, the parties agreed on four explicit § 727(a)(4)(A) claims the Court would decide based on the evidence admitted at trial:

> a. Defendant testified he had no ownership interest in SubCrazy Inc. when he allegedly does hold a hidden beneficial interest;
>
> b. Defendant testified that his daughter Ashley Lombard signed a certain business loan application and related documents in which Café Bella Sera, LLC (not Inc.) was listed as borrower and American Express Travel Related Services, Inc. was lender;
>
> c. Defendant testified at the first adversary proceeding that the shares of CBSI may have been owned by Patrilom, LLC rather than him being 100% shareholder; and
>
> d. Defendant testified that he repaid a portion of a (disputed) loan from Mr. Browne by giving Mr. Browne "gift cards" redeemable at Café Bella Sera.[36]

Browne also filed the motion to amend the complaint that he had previewed at the final pretrial conference, seeking to add a § 727(a)(4)(A) count alleging that the Debtor gave a false oath when he testified that he had no role at Patrilom.[37]  Browne now claimed to have proof that this testimony was false because he had recently obtained documents from TD Bank—in connection with the Patricia Lombard AP—in which the Debtor was identified as a "manager" of

---

[35] The parties had filed a joint pretrial statement in June 2017 (Doc. No. 13).
[36] Joint Final Pretrial Statement (AP Doc. No. 61), ¶ 1.
[37] AP Doc. No. 60 (the "Motion to Amend").

Patrilom.[38]  Browne argued that the Debtor had concealed the existence of any Patrilom TD

Bank account and records during discovery in the Browne II adversary.  He pointed to a request

for the production of documents, asking for "[a]ny and all bank statements and cancelled checks

relating to any accounts out of which Peter Lombard deposited or withdrew funds or on which he

had signature authority for the time period of May 1, 2013 to December 30, 2014."[39]  The Debtor

answered this question as follows: "The account records for this time period regarding SubCrazy,

Inc. have been provided.  Records related to CBSI are either in storage tubs in the State of

Florida or are inaccessible due to the landlord lockout of CBSI from the premesis [sic] in

Florida."[40]  The Debtor initially objected to the Motion to Amend, but before the scheduled

hearing, the parties filed a stipulation agreeing to allow the amendment.[41]  The Court approved

this stipulation shortly thereafter.[42]  In the same order, the Court also approved two other

stipulations, one in which the parties agreed that the Debtor had no records to prove any claim

that he provided Browne with $80,000 worth of gift cards,[43] and another where they agreed on

the details of certain banking transactions between the Debtor, Patrilom, and Sub Crazy, to do

away with the need to establish these minutiae at trial.[44]

### (v)  The Patricia Lombard AP and Decision

The Court held the trial in the Patricia Lombard AP on January 11, 2018.  Two witnesses

testified, Patricia Lombard and the Debtor.  After the conclusion of the trial in the Patricia

Lombard AP, the parties moved to admit portions of Patricia Lombard's testimony and certain

exhibits into the record of the upcoming Browne II trial.  The purpose of this request was to

---

[38] Ex. 13 at 11-12.
[39] Motion to Amend, Ex. K at 5: ¶ 1 (AP Doc. No. 60).
[40] Id.
[41] AP Doc. No. 63.
[42] AP Doc. No. 72.
[43] AP Doc. No. 65 at 4, ¶ 17.
[44] AP Doc. No. 66.

avoid duplicative testimony on the issue of the Debtor's alleged, hidden, beneficial interest in Sub Crazy in the upcoming Browne II trial. The Court approved the request.[45] The Court's opinion in Browne v. Patricia Lombard, 2018 BNH 007 (the "Patricia Lombard Decision"), discusses this testimony in detail:

> At some point in late 2013 or early 2014, the Debtor ceased working for Café Bella Sera and moved from Florida to New Hampshire to start a restaurant business of her own, Sub Crazy, Inc. ("Sub Crazy"). The record is devoid of any information about the decision to start this new business, whose idea it was, or when and why the decision was made. Café Bella Sera, Inc. and Patrilom provided significant amounts of money to Sub Crazy during late 2013 and early 2014, in the months leading up to the opening of Sub Crazy in May 2014. The precise amount of these transfers is not material to the outcome of this proceeding, but the total amount was more than $50,000.[46] Both the Debtor and Peter Lombard signed the checks effecting the transfers of these funds.
>
> Of these funds intended for Sub Crazy, about $10,000 was transferred from a Café Bella Sera account directly to the Debtor's personal checking account.[47] Peter Lombard signed the withdrawal and deposit slips that transferred these funds to the Debtor's account. The Debtor did not recall these specific deposits at trial. There is no evidence about what happened with the money after it was transferred to the Debtor's account.
>
> The money did not flow just one way, from Café Bella Sera to Sub Crazy; Sub Crazy also transferred money back to Café Bella Sera to help that business with its expenses. Peter Lombard personally cashed some of the checks written on Sub Crazy's account, i.e. he went to the bank and cashed checks that either he or the Debtor had written.[48] In their testimony, both Peter Lombard and the Debtor were open about the fact that these transfers were just to help out the separate businesses.
>
> Around this time, the Debtor asked her daughter to review Sub Crazy on the business rating service, Yelp. The review includes the sentence: "Spoke to the owner and **he** said keep your eyes open for PIZZA!"[49] The review's author again identifies the owner of the store as "he" later in the review.[50]

---

[45] AP Doc. No. 82.

[46] See, e.g., Ex. 10, a summary of transfers into Sub Crazy's business bank account.

[47] The $10,000 was transferred in two deposits, one on 1/2/2014 and another on 1/21/2014. Ex. 11.

[48] Trial Transcript at 122: 4-25; 123: 1.

[49] Ex. 21 (emphasis added).

[50] Patricia Lombard Decision at 4-5 (emphasis in original)(citations omitted). The relevant testimony from the trial in the Patricia Lombard AP appears at Ex. 38. The Sub Crazy checks that the Court discusses in this passage appear at Exs. 6 and 7. The Yelp review appears at Ex. 17.

*(vi) The Browne II Adversary Proceeding – Trial on the Merits*

The Court held the trial on the complaint in <u>Browne II</u> on March 22, 2018.  Five witnesses testified, including the Debtor.  The Debtor testified extensively about each of the legal claims at issue.

(a)  The Debtor's Role at Patrilom

The Debtor testified about a number of documents that relate to his role at Patrilom.  The first of these is an installment agreement with the Internal Revenue Service that the Debtor testified he signed as a "managing member" of Patrilom in May of 2013.[51]  The Debtor explained that he signed this document in that capacity because his attorney at the time directed him to do so, even though he was not a managing member of that entity.[52]

Next, the Debtor testified about a business loan and security agreement between Patrilom and American Express Travel Related Services Company, Inc. that he signed on behalf of "Patrilom d/b/a Pete's Café Bella Sera."[53]  On the signature line of this document, the Debtor identifies himself as the "G.M.—Chief Operator—Head Chef."  Notably, the penultimate page of this exhibit is a schedule of ownership of Patrilom.  It lists Patricia and Ashley Lombard, but does not include the Debtor.  This portion of the document appears to be signed by Ashley Lombard.

The Debtor also testified about a set of interrogatories he answered on behalf of Patrilom "dba Pete's Café Bella Sera and Steakhouse," in connection with prepetition state court litigation completely unrelated to his dispute with Browne.[54]  The relevant part of these interrogatories

---

[51] Ex. 31.
[52] Trial Transcript, 29: 1-23; 30: 2-6.
[53] Ex. 32.
[54] Ex. 33.

was the signature line, which reads "signature of Authorized Agent for Patrilom, LLC."[55]  The Debtor testified that he signed the interrogatories at the direction of his attorney and specifically noted that he signed it both because of the "dba" and because he was being sued individually.[56]

Finally, the Debtor testified about an email he received from one Jeremy Miller.  This email read "Hello Peter, Sign and send back when you can. This is the correct one."[57]  Attached to the email is a "Consulting Services Agreement," identifying the client as "Patrilom, LLC DBA Petes [sic] Café Bella Sera & Steakhouse."  Peter Lombard testified that his signature appears at the bottom of the agreement with the title of "MGMB," which he explained meant "managing member."[58]  There was no testimony about whether the Debtor ever fully executed the agreement—the email implies that it had not been executed—or even replied to the email. Nothing else in the record sheds light on this subject.

(b)  The Debtor's Hidden Beneficial Interest in Sub Crazy

Next, the Court will address the Debtor's testimony concerning any "hidden beneficial interest" he held in Sub Crazy.  The Court has already discussed Patricia Lombard's testimony on this issue, which was taken in conjunction with the Patricia Lombard AP.[59]  Peter Lombard also testified about this during the Patricia Lombard AP, but the parties did not admit his testimony from that trial.  Rather, the Debtor answered similar questions directly.  Unfortunately, throughout the Debtor's testimony on this subject, both the questioner and the witness continuously and imprecisely referred to testimony from the Patricia Lombard AP, making the record very unclear on this topic.

---

[55] Ex. 33 at 16.
[56] Trial Testimony at 32: 20-25; 33-34; 35: 1-21.
[57] Ex. 51.
[58] Trial Testimony at 42: 13-24.
[59] Supra at § II(B)(v).

For example, Peter Lombard testified about certain checks[60] made out to "cash" from Sub Crazy's account that he cashed and used to pay vendors and subcontractors on Sub Crazy's behalf:

> Q.      -- that money came to you. Next page, which happens to be Bates stamped 136, same thing. Cash to you, 650. Also negotiated by you and I –
>
> A.      But going -- but going back to these dates, Marc, this -- these are the checks we've already reviewed. And I think that I stated that when these checks were made out to cash and signed by my wife, endorsed by me, this is when Sub Crazy was basically not even operating and was getting –
>
> Q.      Correct.
>
> A.      -- a new operation, if I remember correctly.
>
> Q.      That's correct.
>
> A.      And money was being sent to vendors and contractors being paid cash. I think I said that in the testimony before.
>
> Q.      You may have mentioned that –
>
> A.      Yes.
>
> Q.      -- but you -- you don't have your records showing where that money would have went other than you, right?
>
> A.      Well, it didn't go to me.
>
> Q.      Okay. Well, some of it did. You testified at least one $2500 check you needed for your –
>
> A.      Correct.
>
> Q.      -- business, right? Okay. So in any event – all right, let's stay on page 135. There's the $3700 check made out to you cash. That's the one that ended up in Patrilom's account, right?
>
> A.      If that's what I said, yes.
>
> Q.      Okay.

---

[60] Ex. 6.

A.      I don't have that deposit slip in front of me.[61]

The Debtor also testified about a number of times where Sub Crazy wrote him a check directly and he used the money to help Café Bella Sera make payroll.[62]  The Debtor elaborated that Patricia Lombard authorized these transfers, not for any business purpose of Sub Crazy's, but rather just to help out Café Bella Sera.[63]  Finally, the Debtor identified an undated photograph as the front of the Sub Crazy store.  The words "Family Owned and Operated" appear on the door of the restaurant in the photo.[64]

Now the Court will recount the Debtor's testimony concerning who signed the American Express loan agreement.  The Debtor testified that Ashley Lombard signed the documents at Exhibits 1 and 2:

Q.      So you agree that the signatures contained in Exhibit 11 are, in fact, copies or true exemplars of Ashley's signature, right?

A.      Yes.

Q.      And also Exhibit 12, same thing, right? These are a bunch of checks that she signed to Mr. Browne or his company? Those were also hers, right?

A.      Yes. I've seen them.

Q.      And as you look at them are you telling me you -- you think that looks the same as the signature on Exhibit 1 and Exhibit 2?

A.      I mean, there are some similarities but they're definitely different.

Q.      Yeah. I mean, the ones in Exhibit 11 and 12 are a lot nicer and very distinctive, right?

A.      If that's what you want to call it, sure.

Q.      Right. Well, it's just an eyeball test. They don't appear to be the same signatures, do they?

---

[61] Trial Transcript 84: 13-25; 85: 1-15.
[62] Ex. 7 (There are 3 such checks that total $5,500.); Trial Transcript at 86: 25; 87: 1-5.
[63] Trial Transcript at 87: 6-17.
[64] Ex. 39.

A.      Much better than my handwriting.

Q.      Okay. Did you sign her name to Exhibit 1 and Exhibit 2?

A.      Absolutely not.

Q.       Did you have your wife or any other person sign the signature for Ashley in Exhibit 1 and Exhibit 2?

A.      Absolutely not.  She knows about the loan.  She took the phone call.  She signed it.[65]

When confronted with Ashley Lombard's deposition taken in conjunction with litigation in state court, in which Ashley testified that she did not sign either document, the Debtor indicated that he and Ashley were not speaking at the time she gave the deposition.[66]  On cross-examination, the Debtor elaborated that Ashley Lombard had to file her own bankruptcy petition due to the fallout from Café Bella Sera's financial deterioration, which created animosity between them. Ashley Lombard did not testify as a witness.

(c)  Browne's Use of Gift Cards

The Debtor also testified about the gift cards he allegedly gave to Browne to use at Café Bella Sera.  In this testimony he mostly confirmed his prior statements, and elaborated in a few instances.  The Debtor's first elaboration was to clarify his earlier testimony in two instances, both concerning his never having charged Browne for food at Café Bella Sera after Browne began helping out the business financially.[67]  The Debtor testified that Browne never paying for food was more of an aspirational goal on the Debtor's part, rather than a simple truth.[68]  The Debtor explained that Browne would pay when the Debtor was not personally present at the

---

[65] Trial Testimony at 76-77: 1-2.
[66] Trial Testimony at 77: 3-11.
[67] Supra at 8-10.
[68] Trial Testimony at 57-58.

restaurant, and that sometimes, even when the Debtor was there, Browne would refuse to pay with a gift card, which as the Debtor had testified previously was the business's means of providing Browne with free food.  The Debtor also explained that he had no records of the gift card transactions because it was a "slide gift card" and he "never got anything."[69]

Other witnesses testified concerning the gift card issue.  First, Robert Browne testified that the Debtor only gave him two gift cards: one for $2,000 and one for $5,000, the latter of which he did not use.  He also testified that he did not think it was true that he received $80,000 in gift cards.  Browne also testified that his company, Aqua Gulf, spent about $44,000 at Café Bella Sera between 2008 and 2014.[70]  Browne testified that he patronized Café Bella Sera three to four times a week.  Finally, on cross-examination, Browne testified that he did not consider the gift cards repayment for the money he and his companies had given the Debtor and Café Bella Sera.

Browne's friend of fifty-two years, William Cohen, also testified.  Cohen indicated that he went to Café Bella Sera four to five times a week, and sometimes more often.  He testified that "95%" of the time he went, he was accompanied by Browne.  He testified that he did not see Browne paying with gift cards in any amount approaching $80,000 and never saw Browne ask the Debtor to load up his gift card.

Joseph Veno, who worked at Café Bella Sera as a busboy, a server, and a manager from 2008-2011, testified that he never saw Browne pay with a gift card and noted that Browne used an American Express card to pay his bills.  On cross-examination, Veno testified that he was fired in 2011 for giving "product" away for free to customers.

---

[69] Trial Testimony at 58: 25.  In Browne I, the Court found that Café Bella Sera lost access to its electronic records when it lost possession of the real property where the restaurant was located.  Browne I at 3.
[70] Ex. 27, a spreadsheet put together by Aqua Gulf's CFO, showing Aqua Gulf spending at Café Bella Sera.

(d) Salivar's Testimony about the Discovery Process

Finally, Browne's lawyer, Christopher Salivar, testified about the discovery process in

the litigation in Florida that proceeded against Café Bella Sera and Patrilom.[71]  In particular,

Salivar testified that he did not find any evidence of the Debtor providing $80,000 worth of gift

cards to Browne.  Salivar testified that the discovery he reviewed came from "seven large plastic

tubs of unorganized documents"[72] that originated in a storage pod in Florida.[73]  Indeed, Salivar

was specifically questioned about the origin of the "newly discovered" evidence that the Browne

alleges proves the Debtor had a "legal role" at Patrilom:

> Q.    Attorney Salivar, obviously you were here when I was questioning Mr.
> Lombard and do you recall I was asking him about certain documents which, you
> know, were either signed by him as a representative of Patrilom or Patrilom,
> right?
>
> A.    Yeah.
>
> Q.    Including the IRS document and the AMEX document and I think the
> interrogatories were in the range of Exhibit 31 through 34. Are you the one who
> found those?
>
> A.    Yes, sir. I brought actually the originals with me today if those are needed
> for any purpose, but I found those in the seven tubs of materials that I was
> provided by Café Bella Sera's counsel in my post-judgment proceedings.[74]

(e) Post-Trial Practice

At the conclusion of trial, the Court directed Browne to file any written closing on or

before April 6, 2018 and allowed the Debtor to reply on or before April 20, 2018.  Browne filed

his first memorandum on March 30, 2018 and an amended memorandum on April 11, 2018.  The

---

[71] Salivar was not qualified as an expert witness.  Attorney Salivar testified about a wide range of topics.  The Court discounts the balance of his testimony because Salivar was offering his non-expert opinion about the testimony of other witnesses he had heard while waiting to testify and commentary about other documentary evidence in the record.  The Court does not find the nitty-gritty of the state court discovery process relevant to this proceeding.  To the extent exhibits in the record were obtained through that process, those exhibits speak for themselves.
[72] Trial Transcript at 148: 1-2.
[73] Trial Transcript at 153: 21-23.
[74] Trial Transcript at 151: 24-25; 152: 1-10.

Debtor filed his closing memorandum on April 19, 2018.  Thereafter, the Plaintiff requested leave to reply to the Defendant's closing memo and sought, for the first time, to add an additional count to the complaint pursuant to Fed. R. Civ. P. 15(b)(2), made applicable to adversary proceedings by Fed. R. Bankr. P. 7015: namely, that the Debtor had failed to disclose the "income" consisting of cash and checks he had received from Sub Crazy.[75]  The Court permitted Browne to file a reply memorandum and took the Motion to Conform under advisement.  Ten days later, Browne requested permission to correct certain statements in the Motion to Conform, after having received the trial transcript.  The Court granted this motion. This correction had the effect of substantially limiting Browne's initial arguments in the Motion to Conform.  The Court does not include these withdrawn arguments in § IV infra.  The Debtor did not file any additional memorandum, although the Court permitted him an opportunity to file one.

## IV.  POSITIONS OF THE PARTIES

### A.  Debtor's Role and Relationship with Patrilom

Browne argues that the various documents the Debtor habitually signed as "manager" and "managing member" of Patrilom prove the falsity of the Debtor's statement that he had "nothing to do with" that entity.  Browne also argues that the Debtor should as a legal matter be deemed to have the roles he held himself out as having during the ordinary course.  Additionally, Browne argues that the Debtor's admission to owning all the shares of Café Bella Sera, Inc. effectively proves that he also had an ownership stake in Patrilom: Browne attempts to reconcile the evidence showing that Patrilom owned Café Bella Sera, Inc. by arguing that if the Debtor owned Patrilom he could still have effectively (if indirectly) owned "100%" of the shares of Café Bella

---

[75] AP Doc. No. 93, the Motion to Conform.

Sera, Inc.  Finally, Browne argues that this claim is not precluded by the Court's decision in Browne I because the Court approved the stipulation allowing the amendment of his complaint that put this claim in front of the Court.

The Debtor argues, conversely, that the Court already decided this issue in Browne I and that the new evidence does nothing to either alter this as a legal matter, or change the picture in any substantial way.  The Debtor points out that he had always disclosed his check-signing authority for Patrilom, and that he had disclosed a potential officer/manager role in that entity in his SOFA.  The Debtor also argues that when he said he had "no role" he was answering a question Browne's counsel asked him and he interpreted the question to be asking about his legal ownership interest in the company.

### B.  Debtor's Provisioning of Browne with $80,000 in Gift Cards

The Plaintiff argues that the Debtor testified falsely that he provided Browne with $80,000 worth of Café Bella Sera gift cards and "free" food in repayment of the Browne debt. The Plaintiff points to the evidence that Browne continued to spend money at Café Bella Sera, as well as the testimony of himself, William Cohen, Joseph Veno, and Attorney Salivar.  He argues that the Debtor must have known that he did not actually provide Browne with $80,000 in gift cards, making the statements fraudulent.  Finally, Browne argues that the statements were material because whether Browne's claim was paid down is material to the administration of the bankruptcy case.

The Debtor counters that the statements about the gift cards are not material in and of themselves because it is unclear that the Debtor was actually disputing Browne's claim; the Debtor scheduled the claim as liquidated and undisputed.

### C.  Who Signed the American Express Loan Documents

Browne argues that the evidence shows that Ashley Lombard did not sign the loan documents, based on the evident differences between her exemplar signature and the signature on the loan documents. Additionally, Browne points to her state court deposition testimony where she claimed that the signature was not hers.  Browne argues that who signed the loan document is material because it relates to the Debtor's financial affairs vis a vis his wholly owned corporation.  Finally, Browne concludes that the Debtor's statement that Ashley Lombard signed the loan documents was fraudulent because he knew that she had not signed it when he made that statement.

The Debtor argues that who signed the loan documents is not material because the identity of the signatory to the American Express loan documents is not relevant to the administration of the bankruptcy estate and would not lead to the discovery of assets. Additionally, the Debtor argues that the signature appears to be that of Ashley Lombard and there is insufficient evidence in the record to demonstrate that the Debtor knew it was not her signature.  The Debtor also argues that the loan was not a personal loan to him, but rather to a company in which the Debtor had an ownership interest, reducing the overall materiality of the transaction to the bankruptcy case.  Finally, the Debtor argues that the Court should not give weight to Ashley Lombard's deposition testimony since there is ample evidence in the record that she and the Debtor were on bad terms at the time, giving her a motive to lie.

### D.  Hidden Beneficial Interest in Sub Crazy

Browne argues that the Debtor failed to disclose a beneficial interest in Sub Crazy. According to Browne, the evidence shows that the Debtor was paid like an owner of the

company and could take money out "at will."  He argues that Patricia Lombard was effectively a "straw" owner of Sub Crazy, and that the Debtor is the true owner of the business.

The Debtor argues that the evidence shows he was not a record owner, but had check-signing authority and used it to help out Sub Crazy on an informal basis.  He counters that it would have been a false statement to list an ownership interest in Sub Crazy.  The Debtor concludes that none of the evidence shows a hidden property interest in Sub Crazy.

### E.  The Motion to Amend and Undisclosed Income from Sub Crazy

The Plaintiff argues that the Court should grant his motion to amend because the Debtor implicitly consented to the new count by not objecting to the admission of the Debtor's bankruptcy schedules, which he argues are not relevant to any other claim he has made.  Additionally, Browne argues that the Debtor would not be prejudiced by the late amendment.

The Debtor did not file an explicit response to the Motion to Amend, but did object to the new claim in his closing brief, as the Plaintiff had alluded to it at closing argument.

## V.  DISCUSSION

### A.  Legal Standards Common to All Claims

The Court begins with the legal standards common to all of Browne's claims.  "[T]he statutory right to a discharge should ordinarily be construed liberally in favor of the debtor."  Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987)(citations omitted).  "On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs."  Id.  The Court must be "deft and evenhanded" in harmonizing these often antagonistic precepts.  Id.

Section 727(a)(4)(A) provides that a debtor will not receive a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." § 727(a)(4)(A). "The elements that must be proved to avoid discharge under this provision are (1) the debtor knowingly and fraudulently made a false oath, and (2) the false oath related to a material fact in connection to the bankruptcy case." Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 67 (1st Cir. 2004) (citing In re Tully, 818 F.2d at 110).

"A debtor 'knowingly and fraudulently' makes a false oath if the debtor 'knows the truth and nonetheless willfully and intentionally swears to what is false.'" Hannon v. ABCD Holdings, LLC (In re Hannon), 839 F.3d 63, 72 (1st Cir. 2016) (quoting Lussier v. Sullivan (In re Sullivan), 455 B.R. 829, 837 (B.A.P. 1st Cir. 2011)). "A false oath is material if its subject matter 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" Premier Capital LLC v. Crawford (In re Crawford), 841 F.3d 1, 8 (1st Cir. 2016) (quoting In re Tully, 818 F.2d at 111).

"A debtor's discharge should not be denied under § 727(a)(4)(A) if the false statement or omission is the result of mistake or inadvertence . . . or if the mistake is technical and not real." Mei Yan Zhou v. Wen Jing Huang (In re Wen Jing Huang), 544 B.R. 256, 263 (Bankr. D. Mass 2016) (quoting Gordon v. Mukerjee (In re Mukerjee), 98 B.R. 627, 629 (Bankr. D.N.H. 1989)) (internal quotation marks omitted). The burden of proof is on the objecting creditor by a preponderance of the evidence. Harrington v. Donahue (In re Donahue), BAP No. NH 11-026, 2011 WL 6737074, at *11 (B.A.P. 1st Cir. Dec. 20, 2011).

### B.  Debtor's Role and Relationship with Patrilom

The Court will first address whether Browne's claim regarding the Debtor's statements about his role at Patrilom is precluded by its decision in <u>Browne I</u>.  Neither party offered extensive argument on this issue, but both closing briefs did address it.[76]  The Court finds it appropriate to address in detail, especially in light of the explicit discussion the Court and the parties had on this topic at the pretrial conference in this case.[77]  After finding that claim preclusion applies, the Court will make alternative findings based on the merits of Browne's § 727(a)(4)(A) claim.

#### (i)  Claim preclusion

Claim preclusion prevents a party from relitigating claims that were or could have been made in a prior legal proceeding.  Claim preclusion serves, in part, to prevent "gamesmanship and the added litigation costs of claim-splitting."[78]  <u>Airframe Sys., Inc. v. Raytheon Co.</u>, 601 F.3d 9, 14 (1st Cir. 2010).  "Claim preclusion applies if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related."  <u>Id.</u> (citing <u>Sutliffe v. Epping Sch. Dist.</u>, 584 F.3d 314, 325 (1st Cir. 2009); <u>Negrón–Fuentes v. UPS Supply Chain Solutions</u>, 532 F.3d 1, 10–11 (1st Cir. 2008); <u>Apparel Art Int'l, Inc. v. Amertex Enter., Ltd.</u>, 48 F.3d 576, 583–84 (1st Cir. 1995)).  Here elements (1) and (3) are plainly satisfied.  <u>Browne I</u> resulted in a final judgment on the merits, and the parties are

---

[76] <u>Supra</u> at § IV(A).

[77] <u>Supra</u> at § II(B)(iv)(a).

[78] The other use of claim preclusion identified in <u>Airframe</u> is the conservation of scarce judicial resources.  <u>Id.</u>  Here, the Debtor neglected to make use of claim preclusion during the pretrial phase of this proceeding, blunting the full practical usefulness of the doctrine in this case.

the same individuals as in <u>Browne I</u>.  The Court only needs to discuss the identity of the claims in detail.

 There can be no serious doubt that the Patrilom claim is the same as the claim in <u>Browne I</u>.  In the decision following the trial in that proceeding, the Court summarized the claim and evidence relating to the claim as follows:

> Browne impugns the Debtor's statements at a 2004 examination that he had "nothing to do" with Patrilom, LLC. At trial, the Debtor stated that he had no ownership interest or authority over Patrilom but also acknowledged that he had some ability to sign checks written on Patrilom's bank account.[79]

 This description could equally apply in this case.  The only difference is the evidence Browne has presented.  Newly discovered evidence can serve to prevent the application of claim preclusion, but only if that evidence "could not with due diligence have been previously discovered."  <u>Poirier v. Massachusetts Dep't of Corr.</u>, 160 F. Supp. 3d 399, 405 (D. Mass. 2016), <u>on reconsideration,</u> 186 F. Supp. 3d 66 (D. Mass. 2016).  Here, the Court finds that Browne did not exercise the diligence that was due in discovery during <u>Browne I</u>.  Such diligence would likely have lead to the discovery of the very evidence being offered here.

 The new evidence in question consists of the TD Bank document opening an account for Patrilom at that institution, the IRS agreement, American Express loan documents, responses to a request for documents, and an email about a potential consulting agreement.  Attorney Salivar testified that all of this evidence, save the TD Bank records, came from the Florida storage unit.[80]  The Court knows from the record in <u>Browne I</u> that Browne was at least aware of the sources of this evidence,[81] i.e. that Patrilom had at least one bank account and that the Café Bella

---

[79] <u>Browne I</u> at 11.  The Court has quoted both the 2004 exam transcript and testimony at issue in <u>Browne I</u> <u>supra</u> at § II(B)(i).
[80] <u>Supra</u> at § II(B)(vi)(d).
[81] <u>Supra</u> at § II(B)(ii) where Browne's counsel asks the Debtor about the existence of the storage unit and its contents in Florida.

Sera business had a storage unit in Florida containing business documents.  But Browne made no apparent effort in the prior case to obtain any of that documentation.[82]  It is possible that this was a strategic decision.  Part of the claims in <u>Browne I</u> involved the Debtor's inability to produce records, and Browne may have been concerned that those records would have supported the Debtor's case and not his own.  Such strategic considerations are exactly the type of "gamesmanship" that claim preclusion is supposed to prevent.  Accordingly, the Court concludes that Browne did not exercise sufficient due diligence in the prior case for the newly discovered evidence exception to claim preclusion to apply.

Browne's argument against the application of claim preclusion, undeveloped as it is, is equally unavailing.  Essentially, Browne argues that in approving the stipulation that added this claim to the complaint prior to trial, the Court necessarily ruled that claim preclusion did not apply.[83]  However, the stipulation in question explicitly reserved the Debtor's right to "contest and dispute the merits of the issue being included in the trial of this matter."[84]  As the Court interprets this stipulation, this reservation explicitly preserved the Debtor's claim preclusion argument.[85]

For these reasons, the Court finds that claim preclusion bars this aspect of Browne's § 727(a)(4)(A) claim.

---

[82] <u>Browne I</u> at 9, where the Court discusses Browne's decision to not inspect bank account records.

[83] <u>Supra</u> at § II(B)(iv)(c).

[84] "Stipulation of the Parties with Respect to Plaintiff's Motion for Leave to Amend to Include as a Basis for Denial of Discharge, Plaintiff's Testimony Under Oath that he had had [sic] no Role in Patrilom, LLC." AP. Doc. No. 63 at ¶ 4.

[85] Although no discovery disputes are before it, the Court notes for the sake of completeness that the Plaintiff alleged discovery misconduct in the Debtor's failure to produce the TD Bank records in response to a document request.  <u>Supra</u> at § II(B)(iv)(c).  There is no evidence in the record that would tend to indicate that the Debtor had possession of the TD Bank records.  Additionally, it is not clear that the Plaintiff ever asked the Debtor for a list of all Patrilom bank accounts.  The Court cannot glean any discovery misconduct from the evidence in the record.

*(ii)  § 727(a)(4)(A) Merits*

Alternatively, the Court will make findings concerning the substantive § 727 claim, both because the evidence is readily available and because the discussion of these findings is not too onerous.  Fundamentally, the new evidence discussed above has not changed the Court's view of this claim since <u>Browne I</u>.  In that decision the Court found the evidence insufficient to conclude that the Debtor's statement that he had "nothing to do with Patrilom" was knowingly and fraudulently false, given the context of that statement.[86]  That context is that the Debtor disclosed Patrilom on his SOFA, indicating that he might be considered an officer of the company, and that he has always acknowledged some agency for the LLC, namely check-writing authority.  The only new question for the Court to answer is whether the Debtor's various statements about his relationship to Patrilom are knowingly and fraudulently false in light of the new evidence.

First, the Court will discuss the falsity element of § 727(a)(4)(A).  Broadly, the new evidence indicates that the Debtor, at least a few times, acted as an agent for Patrilom by signing a settlement agreement with the IRS, by signing loan documents with American Express, and by signing interrogatories.  The Court discounts the email containing the unsigned consulting agreement because there is no evidence that it was actually executed.  Additionally, the Court does not find the TD Bank documents persuasive in light of the Debtor's continual acknowledgement of his check-signing authority.  The documentary evidence Browne presented actually supports the Debtor's claim in that regard.  The Court also notes that Ashley Lombard co-signed all of the TD Bank documents, another fact consistent with the Debtor's story that Ashley was a titled, managing member of Patrilom.

---

[86] <u>Browne I</u> at 12.

This new evidence demonstrates at best that the Debtor was an ad hoc agent for Patrilom a few times.  It is not evidence of such an extensive agency to tip the scales toward the Debtor's statements being false.  Since Browne I, the Debtor and Browne have disagreed about the meaning of the "no role at Patrilom" statement.  Browne interprets the statement broadly.  The Court understands Browne's interpretation to be more akin to the Debtor having said "I never acted on behalf of Patrilom."  On the other hand, the Debtor has explained that he always understood "role" to mean "legal role" as in an owner or officer of the company.  The Debtor testified to this effect on cross-examination, and this testimony was consistent with his explanation in Browne I.[87]  The Court finds that the Debtor's view is the better one. It is more consistent with the disclosures the Debtor has made from the beginning.

With that understanding the Court has no trouble finding that the Debtor's statement about not having an official role at Patrilom is not false by a preponderance of the evidence. A few new documents are not enough to convince the Court that the Debtor was lying about not having an official role at Patrilom.  The company was operating from 2009 to 2014.  If the Debtor was an officer the whole time, the Court would expect to see more evidence of such activity than was offered.

Even if the Debtor's statement was false, the Court cannot find by a preponderance of the evidence that he intentionally testified falsely in satisfaction of the second element of § 727(a)(4)(A).  As the Court has recounted, both Patrilom and Café Bella Sera Inc. participated in operating the Café Bella Sera restaurant business.  The Debtor has always acknowledged being the manager of that business.  There is an important difference in being a "manager" of a restaurant versus being a "managing member" of an LLC.  Browne has sifted through all the

---

[87] Trial Testimony at 90: 15-25; 91; 92: 1-13.

remaining documents that Café Bella Sera has and come up with just a few that Browne signed on behalf of Patrilom.  The Court finds it entirely credible that the Debtor would not have remembered signing these documents, especially given that business was run through two corporations that had ill-defined roles.

Finally, with respect to the materiality element, the Court does not find the Debtor's statement about having "no role" to be material in light of the other disclosures he had made: his signing checks on Patrilom's behalf; his describing his relationship to the LLC in his SOFA, and his explaining Patrilom's role in the Café Bella Sera business.  In this context, the Debtor clearly put the creditor body and the trustee on notice that Patrilom could potentially be relevant to his bankruptcy estate.  At base, the Court finds the "no role" statement to be a prime example of a "technical and conjectural" statement and not one that is "real and substantial" that could lead to a false oath.  See In re Wen Jing Huang, 544 B.R. at 263.  Browne has taken the same answer to the same question, asked repeatedly over the course of several years of litigation, and created a tempest in a tea cup.

### C.  Gift Cards

Next, the Court will address whether the Debtor's statements concerning gift cards he gave to Browne amount to false oaths for which the Court should deny his discharge.  The oaths in question occurred in at least two instances.  First, the Debtor's testimony during Browne I and, second, his testimony during a 2004 exam.[88]  The Court has reviewed this testimony in detail and considered it in light of the rest of the evidence.  After this review, the Court must disagree with an assumed premise of Browne's argument—that the Debtor has disputed the amount of the debt

---

[88] Supra at § II(B)(iii)(a).

34

he owes Browne.  Both Browne and the Debtor agree that the amount of the debt is

approximately $387,000.

It is entirely unclear to the Court that the Debtor stated either during <u>Browne I</u> or at his

2004 examination with the UST that he paid down the Browne debt by an additional $80,000 in

gift cards.  The key back and forth is the following section of the transcript:

> Q.     How much did you pay him back all together? It wasn't clear to me?
>
> A.     It was probably, you know, from checks that were written from the business, **<u>not including</u> gift certificates and signing of checks and having him have events there that I didn't charge him for**, probably close to $100,000, but $20,000 was in actual checks, probably about $80,000 over a four-year period of time.
>
> Q.     Of checks?
>
> A.     That was in food.  This is a guy that gave me $300,000.  I never charged him a nickel when he came to the restaurant.  He would drink 5 bottles of Simi Cab.  He would eat T-bone steaks.  He would have 10 people there from his company.  He never got a bill.[89]

The Court's interpretation of this testimony is that the Debtor is saying that he is not "including"

the "gift certificates" and "events . . . I didn't charge him for" in the amount he paid back.  The

meaning of the follow-up question, "of checks," is totally unclear to the Court, given the

compound nature of the Debtor's answer.  The Court cannot find by a preponderance of the

evidence, from this testimony, that the Debtor is claiming he owes Browne $80,000 less than the

$387,000, especially in light of the fact that both sides have explicitly agreed on the correct

amount of the debt.

On the contrary, the Court finds that the entire gift card dispute, rather than being about

the amount of the debt, is about whether it was true that the Debtor provided Browne large

amounts of free food as a gesture of good will for Browne's financial assistance.  The undisputed

---

[89] Ex. 21.  Transcript of January 3, 2017 2004 Examination at 46: 14-23; 47: 1-6 (emphasis added).

evidence concerning the amount of the Debt is that it is $387,080.43.[90] During this proceeding, the Debtor has not challenged this accounting, and this accounting does not include adjustments for "gift cards" or "free food." The Court so concludes in light of the other evidence, including the Debtor's scheduling of the Browne debt as undisputed and liquidated. Rather than being material to the administration of the bankruptcy case, this disagreement is more of a personal dispute, based on principle, between Browne and the Debtor. The Court does not need to resolve such immaterial disputes.

Alternatively, even if the Court did find the Debtor's statements concerning the gift cards and free food to be material, Browne has not demonstrated by a preponderance of the evidence that such statements were false. The Court begins by noting that Browne has set out a difficult task for himself in endeavoring to prove a negative, namely that the Debtor did not provide him a large amount of gift cards or free food. Browne attempted to prove up his claim by offering the testimony of several witnesses, including himself. All of these witnesses basically testified along the same lines, namely that Browne was at Café Bella Sera very often—three or more times a week for long periods of time. Each of the witnesses testified that Browne usually paid with a credit card, not a gift card.

The documentary evidence does not, however, support the witnesses' testimony. In Exhibit 27, Browne presented evidence of credit card charges that either he or his company incurred at Café Bella Sera. If Browne had paid for meals at Café Bella Sera at least three times per week, the Court would expect to see twelve charges per month in the summaries in Exhibit 27, and sometimes more. Exhibit 27 shows nowhere near this many charge per week.[91] Rather,

---

[90] Ex. 25.

[91] The Court picks three times a week as the benchmark rate because Browne testified that he went to Café Bella Sera three to four times per week. Three times a week would be the lower bound of the rate of charges per week that the credit card charge summaries would need to evidence in order to support Browne's testimony.

it appears as though Browne incurred charges only several times a month—excluding four exceptional months between 2008 and 2012, where Browne incurred charges more than six times in a month.  And, these four exceptional months do not occur in the same calendar year.

The Court can see at least two explanations for the inconsistency between the documentary evidence and the testimonial evidence.  On one hand, Browne, the Debtor, and the rest of the witnesses could have been mistaken about how frequently Browne patronized Café Bella Sera.  On the other hand, the missing charges could have been visits where Browne paid with a gift card.  Other possible explanations exist.[92]  On a preponderance of the evidence standard, the Court cannot reconcile this evidence in Browne's favor, and cannot conclude that he has proven that the Debtor did not provide him with large amounts of gift cards and free food.  It is Browne's burden to meet, and he simply has not met it.

### D.  Identity of the Signatory to the American Express Loan Documents

Next, the Court will address the issue of the Debtor's statements that Ashley Lombard signed the American Express loan documents.  The Court finds that Browne has not met his burden of proof to demonstrate that these statements are material within the meaning of § 727(a)(4)(A).  Browne argues that the statements are material because they concern the Debtor's wholly owned corporation.  This argument presupposes that every statement concerning a corporation wholly owned by the Debtor will be material.  The standard for materiality is not so broad.  For a statement to be material it must relate to the administration of the bankruptcy estate, relate to the estate itself, or relate to the debtor's business dealings or financial transactions.  See In re Crawford, 841 F.3d at 8.  Here, the financial transaction did not involve

---

[92] For example, Exhibit 27 may not be a comprehensive record of Browne's credit card charges, or maybe he paid with cash at times.  However, Joseph Veno testified that Browne paid with an American Express card, and the credit card charges summarized in Exhibit 27 were made with an American Express card, so the Court finds the "cash payment" explanation less likely.

the Debtor personally and it is not otherwise apparent how the identity of the signatory could

lead to the discovery of assets or otherwise relate to the administration of this bankruptcy estate.

Browne has not offered any other evidence to show how the signature matters in the context of

the Debtor's personal bankruptcy.  To the Court, rather than being material, the statements about

who signed the American Express loan documents—even if false—are emblematic of the

category of technical falsities that cannot lead to a denial of the Debtor's discharge.  See In re

Wen Jing Huang, 544 B.R. at 263.

### E.  Hidden Beneficial Interest in Sub Crazy

Now the Court turns to the issue of the Debtor's purported hidden beneficial interest.

Here, the false statement in question is the Debtor's failure to disclose this interest in his

bankruptcy petition as well as his denial of any interest in Sub Crazy in testimony.  The evidence

pertinent to this topic was introduced in the Patricia Lombard AP.  The Plaintiffs in that

proceeding made an essentially identical claim, and the Court disposed of that claim in findings

that are directly applicable in this case:

> The Plaintiffs spent a significant amount of time trying to establish that
> Peter Lombard was the *de facto* owner of Sub Crazy.  Yet, the Plaintiffs never
> provided any legal argument to back up their contention that Peter Lombard was a
> secret owner of Sub Crazy.  The documentary evidence presented at trial
> consistently shows that Patricia Lombard was the legal owner of Sub Crazy.  The
> filings with the New Hampshire Secretary of State are consistent in that
> representation, as are the Debtor's schedules.  At best, there is evidence that Peter
> Lombard exercised a modicum of control over Sub Crazy's bank account.  But, it
> is entirely unclear how pervasive that control was.  The Plaintiffs were quick to
> identify the checks Peter Lombard had written on Sub Crazy's accounts, but
> provided no evidence of how prevalent such transactions were when compared to
> all of the checks that Sub Crazy wrote in the ordinary course.  The Court entirely
> discounts the Yelp review—circumstantial evidence about the gender of Sub
> Crazy's owner does not tip the scales in the Plaintiffs' favor, especially when the
> review's author did not testify.
> Another fundamental problem with the "hidden beneficial interest" claim
> is that the Plaintiffs did not establish that Peter Lombard held that interest prior to
> the Debtor's bankruptcy filing.  If, for example, the Plaintiffs had pursued and

obtained a judgment prepetition declaring that Peter Lombard had a beneficial interest in Sub Crazy, then the Debtor would have been required to disclose such an interest in her bankruptcy schedules.  However, there is no such judgment.  In effect, the Plaintiffs are asking the Court to find—based on some unarticulated legal principle—that Peter Lombard is an equitable owner of Sub Crazy and then hold the Debtor retroactively responsible for having failed to schedule that interest on her bankruptcy petition when it was filed.  Such an argument is entirely without merit.

Additionally, the Court finds that the evidence does not support the Plaintiffs' theory that the Debtor was a mere straw owner of the Sub Crazy business.  There is virtually no evidence about whose idea it was to start the business or any of the decision making process that lead to the business's creation.  Neither the Debtor nor Peter Lombard were asked any questions on this topic.  The only relevant question the Debtor was asked is whether she had any prior experience running a restaurant.  Simply taking the fact that the Debtor had never run a restaurant before Sub Crazy and putting it beside the fact that Peter Lombard has extensive experience running restaurants is insufficient to demonstrate by a preponderance of the evidence that the Debtor was a straw owner of the business.  The Plaintiffs have not established an evidentiary foundation for this theory.[93]

Just as in the Patricia Lombard AP, Browne has failed to develop a legal argument that would allow the Court to "deem" the Debtor to be an equitable owner of Sub Crazy.  Moreover, Browne has failed to explain how the Debtor could be held retroactively accountable for the ramifications of such a legal finding, even if the Court were to make one.  The Court finds both of these faults sufficient to deny Browne relief on this claim.

### F.  Patrilom as Parent Company

The Court will now address Browne's claim concerning the Debtor's testimony in Browne I that Patrilom was the parent company of Café Bella Sera, Inc.  Browne did not discuss this claim in his opening statement, closing argument, or in any of his post-trial briefs.  Nevertheless, the Court will address the claim on the merits.  As the Court has summarized above, the evidence regarding whether Patrilom owned the shares of Café Bella Sera Inc. is contradictory.  On the one hand, the Court has the portion of the summary judgment record in

---

[93] Patricia Lombard Decision at 17-19.

which the Debtor acknowledged that at all "relevant times" he owned all the shares of Café Bella Sera, Inc.  On the other hand, there is the Debtor's repeated testimony that Patrilom was the holding company of Café Bella Sera, Inc.; his same statements in his schedules; the letter from the Florida Department of Revenue indicating that Patrilom owned Café Bella Sera, Inc., and the unsigned purchase and sale agreement between Café Bella Sera, Inc. and Patrilom.

On this record there is no way to reconcile this evidence.  Not only did Browne not object to the admission of the evidence that contradicts the statement of material facts from the summary judgment record, he himself offered all the conflicting evidence—save for the purchase agreement, which the Court affords little weight because it is unsigned.  The Court finds the Department of Revenue letter marginally more persuasive on this topic because although the information on which it was based undoubtedly originated from Patrilom, the letter comes from a source that is not controlled by Browne or the Debtor.  Browne made no effort to explain how the Court should reconcile this evidence, beyond making the baffling argument that if Patrilom did own Café Bella Sera Inc., then the Debtor must have owned Patrilom—an argument offered in connection with the "no legal role at Patrilom" theory discussed above.  The Court does not find the inference Browne makes to be sound.  While the Debtor acknowledged that he owned all the shares of Café Bella Sera in the joint statement of material facts, he never claimed that he indirectly owned all of the shares of Café Bella Sera through Patrilom.  To the contrary, the Debtor has clearly disputed any claim that he owned Patrilom.  Because the Court cannot reconcile this evidence, it cannot find it more likely than not that the Debtor made any false statement when he testified that Patrilom owned the shares of Café Bella Sera, Inc.  Accordingly, Browne cannot succeed on his § 727(a)(4)(A) claim on this ground.

### G.  The Motion to Conform

Federal Rule of Bankruptcy Procedure 7015, applying Federal Rule of Civil Procedure 15(b), "permits the consideration of unpleaded claims 'by express or implied consent' of the parties."[94]  Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1172 (1st Cir. 1995); Fustolo v. The Patriot Group LLC (In re Fustolo), No. 17-1984, 2018 WL 3424797, at *4-5 (1st Cir. July 16, 2018).  "Implied consent occurs by either treating a claim introduced outside the complaint as having been pleaded, either through the party's effective engagement of the claim or through his silent acquiescence; or by acquiescing during trial in the introduction of evidence which is relevant only to that issue."  Fustolo, 2018 WL 3424797, at *5 (quoting Antilles Cement Corp. v. Fotuno, 670 F.3d 310, 319 (1st Cir. 2012)) (internal quotation marks omitted).  But "the introduction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case."  Id. (quoting DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 917 (1st Cir. 1992)).

Here, Browne wants the Court to deem the Debtor to have implicitly consented to the litigation of his failure to schedule in his SOFA, as income, amounts he received in checks from Sub Crazy.  According to Browne, three exhibits bear on this issue: 6, 7, and 9.  Exhibits 6 and 7 are Sub Crazy checks, and Exhibit 9 consists of the Debtor's bankruptcy schedules (including his SOFA).  In the Supplement to his Motion to Conform, Browne argues:

> While the evidence relating to Defendant's receipt of the various Sub Crazy, Inc. checks was relevant to another issue at trial (whether Defendant held a hidden ownership interest in Sub Crazy, Inc.) the admission of Exhibit 9 did not bear on that issue or any other issue raised in the Complaint.[95]

---

[94] "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move-—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue."  Fed. R. Civ. P. 15(b)(2).

[95] Supplement to Motion to Conform at 3 (AP Doc. No. 103).

In other words, Browne himself acknowledges that Exhibits 6 and 7 cannot meet the standard the First Circuit outlines in <u>Fustolo</u>, but argues that the Debtor's bankruptcy schedules were only relevant to the new legal theory.  The Court agrees with Browne's assessment as to Exhibits 6 and 7, but cannot agree that the admission of the Debtor's bankruptcy schedules as evidence effectively put the Debtor on notice that Browne expected to try the newly articulated "income" issue.  Exhibit 9 consists of forty-seven pages of material, most of which has nothing to do with the Debtor's past income.  The broad range of information in the schedules provides general background information in this litigation and specifically relates to Browne's other claims regarding the Debtor's role at Patrilom and the gift card dispute.  The Court has referred to Exhibit 9 in both of those sections of its discussion.[96]  "When evidence presented is relevant to a claim actually pleaded, and not solely to a new issue, the non-moving party is not provided adequate notice that the new claim is being litigated."  <u>In re Fustolo</u>, 2018 WL 3424797, at *6. The lack of adequate notice effectively bars a party from implicitly consenting to the introduction of unpleaded claims.  <u>Id.</u>  Accordingly, because the Debtor did not receive adequate notice of the new claim that Browne seeks to add to his complaint, the Court must deny the Motion to Conform.

## VII.  CONCLUSION

The lengthy travel of the dispute in this Court between Browne and the Debtor merits discussion of the Court's perception of the purpose of this litigation as a whole.  As the Court discussed above, the purpose of a discharge denial claim is to make sure that debtors who conceal their financial history and attempt to mislead creditors do not receive a discharge.

---

[96] <u>See</u> §§ V(F) and (G).

Browne has twice attempted to prove that the Debtor does not deserve a discharge, once in Browne I and again here. Both times the Court found against Browne. Browne also asserted similar claims against the Debtor's spouse in the Patricia Lombard AP. In the Patricia Lombard Decision, the Court found that Browne did not even have standing to pursue his claims against Patricia Lombard, but that even if he did, his claims were without merit.

After three trials in three adversary proceedings, the Court has come to the conclusion that rather than these cases being about debtors who acted in concert to defraud their bankruptcy estates, they are about Browne doing everything he can to prevent Peter and Patricia Lombard from getting a discharge. The Court finds that the best way to view the current adversary proceeding is as a do-over of Browne I. Browne was unsuccessful in Browne I after two apparently serious discovery lapses: his failure to obtain and inspect bank records of the Debtor and Café Bella Sera, and his failure to inspect documents that were in the storage pod in Florida. The Court concludes that these discovery lapses were serious because Browne has used the evidence he discovered from those two sources to support his claims in this proceeding. The Court suspects that had Browne actively pursued that discovery in Browne I—and nothing appears to have prevented him from doing so—the claims now before the Court would have been subsumed in that proceeding.

Browne has attempted to accomplish his do-over of Browne I by dredging up every apparent misstatement the Debtor has made during this case, no matter how immaterial or technical, and shoehorning these misstatements into a § 727 complaint—the contents of which Browne has added to throughout the course of this case, in what the Court sees as an increasingly strained attempt to have the Court deny the Debtor a discharge. This approach does not jibe with the purpose of § 727.

The outcome of this proceeding is no different than in <u>Browne I</u>.  The Court cannot find merit in Browne's claims against the Debtor.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.


Date:   August 31, 2018                    /s/ Bruce A. Harwood
                                           Bruce A. Harwood
                                           Chief Bankruptcy Judge